[Cite as *State v. Webb*, 2013-Ohio-3844.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                           :

    Plaintiff-Appellee                  :           C.A. CASE NO.     25267

v.                                      :           T.C. NO.     11CR2909/1

JEFFREY W. WEBB                         :           (Criminal appeal from
                                                    Common Pleas Court)

    Defendant-Appellant                 :

                                        :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___6th___ day of _____September_____, 2013.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, P. O. Box 291771, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**  This matter is before the Court on the Notice of Appeal of Jeffrey

Webb, filed

June 29, 2012. Webb appeals from his June 8, 2012 Judgment Entry of conviction on one count of possession of heroin, in an amount less than one gram, in violation of R.C. 2925.11(A), a felony of the fifth degree. We hereby affirm the judgment of the trial court.

{¶ 2} Webb was indicted on February 6, 2012. After entering a plea of not guilty, he and a co-defendant filed motions to suppress on March 22, 2012. The trial court held a hearing on the motions on April 30, 2012. At the hearing, Officer Eric Sheldon of the Dayton Police Department testified that he has 10 and a half years of experience as a police officer. He stated that on August 20, 2011, at approximately 7:05 p.m., while on routine patrol in uniform and in a marked cruiser, he and Officer Nathan Speelman observed a purple Plymouth Neon execute a right turn from Catalpa Drive onto Otterbein Avenue without signaling within a hundred feet of the intersection. Sheldon stated that the area is "somewhat of a high crime area. Specifically, there's a lot of drug transactions that go on in that area." Sheldon stated that he has made drug arrests in the area multiple times.

{¶ 3} Based upon the traffic violation, the officers initiated a traffic stop. Sheldon stated that the Plymouth pulled into a residential driveway at 1719 Auburn Avenue, and he stated that the officers pulled into the driveway behind the vehicle. According to Sheldon, as "soon as the vehicle stopped, both the driver and the passenger immediately got out of the vehicle which is somewhat unusual for a traffic stop. Generally people stay in the vehicle till you approach them." Sheldon stated that he was concerned that the occupants were "trying to distance themselves from something incriminating in the vehicle, whether it be a weapon or * * * drugs * * * ."

{¶ 4} Sheldon stated that he and Speelman got out of their cruiser and ordered the occupants back into the Plymouth "just so they could be contained until we could determine

what was going on exactly." Sheldon stated that he then approached the driver's side of the vehicle. Sheldon testified that Speelman "indicated that he saw the passenger place something underneath the passenger seat of the vehicle." Based upon Speelman's observation, Sheldon stated that the officers decided to remove the subjects from the vehicle "to make sure weapons weren't hidden just for our own safety."

{¶ 5} Sheldon determined that the driver of the vehicle was Webb. Sheldon stated that Webb "was kind of nervous. Hands were shaking a little bit." Sheldon testified that he patted Webb down and placed him in his cruiser "just for safety reasons so he was contained while Officer Speelman checked the vehicle for weapons." Sheldon stated that Webb was not handcuffed or placed under arrest. Sheldon stated that Speelman removed the passenger, Steven Howson, from the vehicle and placed him in the cruiser with Webb.

{¶ 6} Sheldon stated that in the course of his search under the passenger seat, Speelman found two gelcaps containing heroin. He stated that if the search had not yielded any drugs or weapons, the men would have been free to leave after the traffic citation was issued. He stated that the purpose of looking under the passenger seat was strictly for officer safety. Sheldon stated that after the drugs were discovered, he read Webb his rights verbatim from a card provided by the prosecutor's office. Sheldon stated that Webb did not appear to be under the influence, that he did not coerce Webb, that Webb appeared to understand the rights he waived, and that Webb did not ask to end the conversation or ask for a lawyer.

{¶ 7} The following exchange occurred:

Q. * * * When you're speaking with Mr. Webb, what did he tell you?

A. He told us that they had been driving through the area. They stopped at a house. He bought some what he called medicine. Then went on to tell us that he had some reoccurring pain that he took medicine for. We asked him to elaborate what that was, the medicine, and he told us it was heroin. At first he told us that he had swallowed the medicine and that's what I saw him doing when he got a drink of water. And then he backtracked and said that he hadn't swallowed it and you know, just some different things. Kind of back and forth like that.

Q. So he was giving you multiple stories about the heroin?

A. Correct.

Q. Did you ask him specifically about the two capsules that were found under the seat?

A. Yes, we did. He at some point, he seemed like he was a little confused as to how many we had found. Like he didn't want to come out quite and say that, you know, the ones we had found were his and kind of like well how many did you find? Kind of indicating that there might be more in the vehicle.

Q. * * * So at that point in time, could Mr. Webb have been placed under arrest for possession of heroin?

A. Yeah, I mean at one point he did admit that the heroin in the vehicle was his. But it later turned out the heroin that he was referring to was not the same that we had actually found.

Q. * * * So he was referring to a totally different I guess container of heroin that what - - that you had not found in the vehicle yet.

A. Correct.

Q. * * * But he did admit to ownership of the heroin?

A. Yes.

Q. * * * And based on Mr. Webb's statements, was he placed under arrest?

A. Not initially. After we found the heroin underneath the passenger seat, we then decided to tow the vehicle for driver arrest. Officer Speelman conducted an inventory of the vehicle which we do before we tow the vehicles to check for valuables. And at that point he found a medicine bottle containing more heroin.

Q. * * * And where was that, if you know, where was that bottle found?

A. It was found in the center console of the vehicle.

Q. It was a medicine bottle. Was there a name on the medicine bottle?

A. It had Mr. Webb's name on it.

Q. And did you also speak with Mr. Webb about the bottle that was found?

A. Yes.

Q. * * * And what did he tell you?

A. He told us that it was his.

Q. And do you know specifically what was found in the medicine bottle?

A. It was three or four capsules.

Q. Of heroin?

A. Yes.

{¶ 8} Speelman testified that he has over six years of experience with the Dayton Police Department. He stated that he was on routine patrol with Sheldon on the date of the incident. He stated that the area of Catalpa and Otterbein is a "typical high drug, high crime area," where he has made multiple drug-related arrests.

{¶ 9} Speelman's testimony is consistent with Sheldon's regarding his observations of the Plymouth Neon and the traffic violation. Speelman stated that he believed that the "occupants were trying to elude us" as the vehicle sped up after turning onto Otterbein and then Auburn. Speelman stated that Webb and Howson exited the Neon before he and Sheldon were out of their cruiser. Speelman stated he was concerned because "at that time we weren't necessarily sure whether or not the vehicle could be stolen and occupants tend to remove themselves from potential contraband or weapons." Speelman stated that the officers ordered the men back into the vehicle, and Speelman stated that he approached the passenger side of the vehicle.

{¶ 10} According to Speelman, as Howson re-entered the car, Speelman "noticed when he sat back down in the vehicle, * * * he had made a lunging motion forward with his upper torso and I also noticed that he dipped his right shoulder and then kind of made a  - -

kind of like a slide back motion with his arm placing something back underneath the passenger seat." Specifically, Speelman stated that Howson placed his right hand between his legs as he was squatting back down, and that he observed some movement underneath the seat. Speelman stated that his "initial concern was that he potentially was sliding a weapon back farther underneath the seat" that had perhaps slid forward in the course of the abrupt stop.

{¶ 11} Speelman stated that upon observing Howson's furtive movements, he advised Sheldon to remove Webb from the car, and Speelman told Howson to get out of the car. Upon his removal, Speelman stated that he asked Howson if he could pat him down, Howson agreed, and after finding no weapons, Speelman put Howson in the back of the cruiser. Speelman stated that he placed him in the cruiser because "of his furtive movements that he made getting back into the car." According to Speelman, "it's basically a control measure." At that time, Howson was not in handcuffs or under arrest, according to Speelman. Speelman stated that Webb was also placed in the cruiser for officer safety.

{¶ 12} Speelman testified that when he looked under the passenger seat, he "noticed a fliptop cigarette pack, the top was open, that was the only thing that I noticed underneath the seat and removed it and at which time upon further examination I noticed that there was two gelatin capsules which contained suspected heroin." He further testified that "drugs and weapons * * * kind of go hand in hand. So I mean there's always that fear that there could be a potential weapon on a person or inside a vehicle." Speelman stated that based upon his training and experience, it is common for drugs to be carried in cigarette boxes. Speelman, like Sheldon, stated that the men would have been free to leave if there had been

no contraband under the seat, after the traffic citation was issued.

Speelman stated that he returned to the cruiser and overheard Sheldon's conversation with Webb. According to Speelman, "the more [Webb] talked, there was an indication that there was potentially more drugs because Mr. Webb was kind of confused on what drugs we might have found or where we might have found them."

{¶ 13} Speelman stated that he removed Howson from the cruiser and read him his rights verbatim from a card issued by the prosecutor's office. He stated that Howson did not appear to be under the influence in any way, that he was not coerced, that he appeared to understand the rights he waived, and that he did not ask to end the conversation or ask for an attorney. Speelman stated that Howson told him that the two capsules under the passenger seat were his. Speelman stated that the car belonged to Webb, and that Webb was issued a citation for failure to signal.

{¶ 14} The following exchange occurred during cross-examination of Speelman by counsel for Howson:

Q. So you did a visual with your eyes of what's under the seat, is that correct?

A. Yes, ma'am.

Q. And you didn't see a gun, did you?

A. No, ma'am.

Q. * * * You didn't see a gun in the car at all, right?

A. No, ma'am.

Q. All you saw was a cigarette pack?

A.  Correct.

Q.  And it was closed.

A.  It was open.

Q.  It was facing you?

A.  Yes - - well I mean the cigarette pack fliptop was open.  So I mean define facing me.

Q. * * * You know how a cigarette pack flips open, it's the hard kind, is that correct, we're talking about?

A.  That's correct.

Q.  All right.  Do you remember the brand?  No, okay.  So if the fliptop is open, it's kind of sitting up.  It's not laying flat, right?  If it's laying flat, then it's closed, is that correct?   Can I get that?

A.  Yes, that would be correct.

Q. * * * So you're saying it's open.   So when it opens, it would have to be angled, that's how it works, is that correct?

A.  Angled or I mean I guess on the front label packaging, if that makes sense.

Q. * * * So you could see in the cigarette pack when you were looking underneath the car, under the seat, is that correct?

A.  Yes, ma'am.

Q.  And you immediately saw these gelcaps?

A.  That's correct

Q.  And it was facing to where you could see it?  It wasn't sideways or angled sideways or angled in any way, is that  - -

A.  No, ma'am.

Q.  And it wasn't that it was in the side where the seat is next to the door.  It was actually under the seat in the front, correct?

A.  It was - - I mean the best way that I'd be able to describe it, it was pretty much directly underneath the middle of the seat.

Q. * * * So the seat conceals it?

A.  Correct.

Q.  It's not like it's hanging on the side?

A.  Correct.

{¶ 15}  The following exchange occurred between counsel for Webb and Speelman regarding his observation of Howson's furtive movements:

Q. * * * Now at this point, did you suspect that there were drugs in the car?

A.  No, ma'am.

Q.  You did not suspect drugs.  You suspected a weapon only?

A.  With his movement, that was my concern was that there would be a weapon in the vehicle.

Q. * * * And that was the only reason that you looked under the seat?

A.  That's correct.

Q.  You did have to look under the seat?

A.  Yes, ma'am.

* * *

Q. * * * But there was no weapon under that seat?

A.  There was no weapon, no, ma'am.

Q. * * * The cigarette pack, when you saw it, do you remember what color the box was?

A.  I can't say for certain.

Q. * * * Do you recall whether or not there was still foil on the top of the box from where you flip the top open and there's foil around the cigarettes?

A.  I don't remember, ma'am.

* * *

Q.  You just remember that there were pills there?

A.  Well, there was two gelatin capsules.

Q.  And you were comfortable enough to reach under the seat?

A.  Yes, ma'am.

Q. * * * Did you have any trouble getting your arm under the seat?

A.  No, ma'am.

* * *

Q. * * * You found - - you pulled the cigarette box out of - - did you flip the top to check and make sure what was in it?

A.  The top was open when I discovered the pack underneath it and

upon removing the pack that is ultimately when I discovered the capsules of heroin.

    * * *

Q. So after you had pulled the box, the cigarette box out from under the seat, that's when you discovered the capsules inside of it?

A. That's - - well I mean I could see that there was something in the bottom. It was an empty cigarette pack and upon removing the pack from underneath the seat is when I was totally able to tell what was inside.

Q. After the cigarette box was out from underneath the seat and in your hands?

A. Correct.

Q. So at that point you walked back to the cruiser and at that point were either under arrest?

A. Mr. Howson would have been placed under arrest at that time.

Q. * * * What about Mr. Webb?

Q. At that time Mr. Webb was not under arrest.

Q. * * * And Mr. Howson was under arrest because that cigarette box had been discovered underneath his seat?

A. And with the furtive movements that I saw, yes, ma'am.

Q. And was Mr. Webb in the back of the cruiser at that time?

A. Yes, ma'am.

{¶ 16} The court's journal entry indicates that it overruled Webb's (and Howson's)

motions to suppress for the reasons stated on the record at the conclusion of the hearing. The court indicated that it found both Sheldon and Speelman to be credible. The court noted Sheldon's ten-year experience as a police officer as well as Speelman's six-year experience. The court noted that it was still daylight at 7:05 p.m., and that both officers indicated that they were in a high crime area. The court found as a matter of fact that "there is enough room to activate a right turn signal before getting within a hundred feet of the intersection" where the driver executed his turn. The court noted that it "is convinced that the vehicle turn signal was activated * * * within that one hundred feet area in violation of the ordnance (sic). And so the Court finds that these officers at that point in time did have not only reasonable suspicion but probable cause to conduct a traffic stop. So the traffic stop that ultimately occurs is a legitimate traffic stop."

{¶ 17} The court noted Speelman's suspicion that "there was some eluding behavior going on here" when the Defendants' vehicle sped up on Otterbein, and it further noted that both officers testified credibly that it is "unusual behavior" for the occupants to have immediately exited their vehicle upon being stopped. The court noted Sheldon's concern that the occupants were trying to distance themselves from the vehicle, as well as Speelman's concern that "this was further potential behavior in terms of eluding the officers."

{¶ 18} The court noted that the officers ordered the men back into their vehicle "to contain the situation and to minimize any potential safety issues," and it determined that doing so "was entirely proper." The court noted Howson's furtive gesture and it determined, "it's important to know it is a gesture done by [Howson] after he knows of the

presence of the police officers. * * * So Officer Speelman then has a concern which the Court finds to be a reasonable concern that what could have been secreted under that seat, the passenger seat, was a weapon."

{¶ 19} Upon removal of the occupants, the court noted Sheldon's observation that Webb appeared to be nervous. The court noted that when the occupants were placed in the cruiser, they were neither under arrest nor handcuffed. Regarding the cigarette box found by Speelman, the court noted as follows:

> * * * And as he testified, he looks under the passenger seat and he notices an open cigarette packet and he notices a substance in them (sic). Not cigarettes. But a substance. Now he also testified that in his experience, drugs are typically carried in cigarette boxes. And so he then pulls the cigarette box out from underneath the seat so that he could look inside the cigarette pack and then he discovers the gelcaps which ultimately contain the heroin.

The court next found that both Defendants knowingly and voluntarily waived their *Miranda* rights.

{¶ 20} The court emphasized that Howson's furtive movements were "in response to or at least could be interpreted by the officers in response to their presence." The court found as follows:

> * * * based upon the totality of these circumstances, Officer Speelman did have reasonable articulable suspicion that there might be secreted under that passenger seat a weapon. And so he was within his authority to look

under the passenger seat. So he was where he had a right to be when he put his head under the seat and then he saw that open cigarette pack.

Now and so (sic) he's making this observation in plain view. And he sees an open cigarette pack and he notices that not within it are cigarettes but some substance. And we have on the record the testimony that drugs are often secreted in cigarette packs. So you have all these additional factors and again, I combine these with all of the factors leading up to the protective search of the vehicle, the furtive behavior by [Howson] and all of the other factors that must also be combined now with this ultimate decision by Officer Speelman to search that cigarette pack.

Now the question is does he at that point in time have probable cause to do that? Ms. Souther says it's a mere hunch that he has. And probable cause is defined as whether under the facts and circumstances there is within the knowledge of the officer reasonably trustworthy information that would warrant a prudent individual in believing that there would be drugs in that cigarette pack.

So applying all of the totality of the circumstances * * * the Court finds that at the point in time Officer Speelman sees the cigarette pack and he sees something in that pack, under the totality of the circumstances, a reasonable - - a person under those facts and circumstances had reasonably trustworthy information that would warrant a prudent person into believing that there may be drugs in that cigarette pack. And therefore, the Court finds

that was a probable cause automobile search that is justified under the *Carroll* doctrine. And so it was a probable cause automobile search that makes this a lawful search of the contents of that cigarette pack and therefore for all of those reasons, the Court overrules both Defendants' motions to suppress.

{¶ 21} On May 11, 2012, Webb withdrew his plea of not guilty and entered a plea of no contest, and he received a sentence of 5 years of community control sanctions.

{¶ 22} Webb asserts one assignment of error herein as follows:

"THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS AS THE SEIZURE OF THE FLIP-TOP CIGARETTE PACK FROM UNDERNEATH THE SEAT OF THE VEHICLE AND SUBSEQUENT SEARCH OF THE CIGARETTE PACK WAS UNLAWFUL."

{¶ 23} As this Court has previously noted:

In addressing a motion to suppress, the trial court assumes the role of the trier of fact. *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002-Ohio-268, citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist. 1994). The court must determine the credibility of the witnesses and weigh the evidence presented at the hearing. *Id*. In reviewing the trial court's ruling, an appellate court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. *Id*. However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." *Id*.

The Fourth Amendment to the United States Constitution protects

individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry,* police officers may briefly stop and/or detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v.Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 10, citing *Terry*. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop. *State v. Walker*, 2d Dist. Montgomery No. 24542*, 2012-Ohio-847,¶ 17-18.

{¶ 24} Further, as this Court has noted: "[T]he police may search the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, if an officer possesses a reasonable belief that an individual is dangerous and may gain immediate control of weapons located in the vehicle upon returning to it. *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *State v. Roye*, 2d Dist. Greene No. 2001-CA-5, 2001 WL 703869 (June 22, 2001)." *Walker*, ¶ 28. "To justify * * * the search of a passenger compartment. 'The police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant that intrusion. * * * ." *Id.,* ¶ 29. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. * * * ." *Id.* *See also,* as cited by the trial court, *State v. Curry*, 2d Dist. Montgomery No. 15028, 1997 WL 24788 (Jan. 24, 1997). (affirming suppression order where "a furtive gesture, consistent with secreting a weapon," in response to a stop for a license plate violation, justified a pat down search).

{¶ 25}    We finally note that the "existence of probable cause satisfies the purposes of the warrant requirement, and relieves an officer of the need to obtain a prior warrant when that is not practicable." *State v. Griffith*, 2d Dist. Montgomery No. 24275, 2011-Ohio-4476, ¶ 15.   "Probable cause arises when 'the facts and circumstances within [a police officer's] knowledge and of which [he has] reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief' that criminal conduct was afoot.  *Carroll v. United States* (1924), 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543, 555." *State v. McClemore*, 2d Dist. Montgomery No. 24211, 2011-Ohio-243, ¶ 16.

{¶ 26}   We initially note that the trial court found both officers' testimony to be credible, and we defer to the trial court's assessment of credibility. Based upon the totality of the circumstances, we agree with the trial court that Speelman's seizure and search of the cigarette pack was lawful.   After observing the traffic violation and initiating the traffic stop, Speelman noted that the Plymouth appeared to be eluding the officers. Sheldon testified that it was "unusual" for the occupants to immediately exit the vehicle as Webb and Howson did, and Speelman testified that their behavior suggested that the men sought to

"remove themselves from potential contraband and weapons." Both officers had made multiple drug-related arrests in the area where the stop occurred. Upon being ordered back into Plymouth, Speelman observed furtive movements by Howson that suggested that he may have been attempting to conceal a weapon under the seat. As the trial court emphasized, this gesture was made while Howson was fully aware of the officers' presence. After the men were ordered out of the Plymouth, Webb appeared nervous. Both officers testified that Webb and Howson would have been free to go after the traffic citation was issued, in the absence of a basis to prolong the stop. As the trial court found, Speelman's testimony makes clear that he had a reasonable, articulable suspicion that a weapon may be hidden under the passenger seat of the car, and he "was within his authority to look under the passenger seat."

{¶ 27} Upon his observation of the open cigarette pack, which did not contain cigarettes but rather, according to Speelman, "something on the bottom," and based upon his training and experience regarding the common practice of concealing illegal drugs in cigarette packs, Speelman looked inside the open pack and found the gel caps. Under all of the above facts and circumstances, Speelman had reasonably trustworthy information warranting his belief that the cigarette pack may have contained drugs. In other words, as the trial court determined, Speelman had probable cause to retrieve the cigarette pack and the gel caps were in plain view therein. There being no merit to Webb's assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

Michele D. Phipps
J. David Turner
Hon. Dennis J. Langer